Good morning, members of the panel and opposing counsel. My name is Linda Bell. I represent Appellant John Kegel. Excuse me, counsel. The acoustics in here aren't that great, so speak loud and clear. Justice, maybe that will help a little bit. Is that better? Thanks. This is a habeas corpus case under 28 United States Code Section 2254, sounding under the Sixth Amendment. This case is about the failure of Mr. Kegel's attorney to notify him that the death penalty was not being sought before Mr. Kegel pled to first-degree murder with use of a deadly weapon. As a result of this failure, Mr. Kegel should be allowed to withdraw his plea. Counsel, we have this deferential standard under 2254 to the highest reason state court decision. So I looked at it, and at page 425 in the excerpts, the state court says, what is this, the second judicial district court for the state of Nevada in the county of Washoe. Hall testified credibly that long before the plea negotiations were entered into, he learned that the state would not seek the death penalty against Kegel, and he communicated this information directly to Kegel. At no time did counsel state or imply that if Kegel went to trial, he would receive the death penalty. To the extent Kegel's testimony draws any of these findings into question, his testimony is not credible. So it looks to me as though we have to accept the fact that Kegel's lying. His lawyer told him the death penalty is off the table, or rather his lawyer never told him that if he went to trial, he would receive the death penalty, and that the state wasn't seeking the death penalty. Isn't it, am I mistaken in thinking we have to take that as a given, and if I'm not mistaken, where do you go from there? Your Honor, a credibility finding unsupported by the record is not entitled to deference. This Court has said that in the case of the state court. But why isn't, where's the record that undermines that? Well, there are two facts found by the state court that are not supported by the record. First, the state court found at no time did counsel state or imply that if Kegel went to trial, he would receive the death penalty. This is belied by the record on, the excerpts of record at page 376. Von Hall testified that he and Mr. Specchio had a conversation with Mr. Kegel early on in the case where Mr. Kegel was told that the death penalty was an option and that the state may be seeking, in fact, be seeking the death penalty. So the state court finding is completely contrary to Mr. Hall's uncontroverted testimony during the hearing. How about this exchange? And I'm quoting from ER 390. Prior to the entry of Mr. Kegel's plea, you were confident that he knew the death penalty was not a possibility in this case. Hall's answer, yes. Mr. Hall testified in the excerpts on page 3. Can I accurately quote the transcript? Yes. Okay. Then tell us precisely what is wrong with the state court having made the factual finding that Judge Kleinfeld just described based in part on what I just read. If we look at Mr. Hall's testimony on page 376 and 77 of the record, Mr. Hall said his testimony about how this information was relayed was, he didn't recall whether or where, but we would have let him know. The state court found that Mr. Hall directly communicated the information that Mr. Kegel was not facing the death penalty to Mr. Kegel, but that isn't Mr. Hall's testimony. Mr. Hall's testimony is we would have let him know. And that is the only information that we have that there was any kind of communication to Mr. Kegel. Well, here's another quote. And I'm quoting. And that's by virtue of the fact that there's a gap there. We can assume it means the prosecutor had not filed the notice of intent to seek. You had talked to the prosecutor about seeking it, and he said no, and you communicated that to Mr. Kegel. Is that right? Hall's answer, that's correct. Mr. Hall, though, never testified that he directly communicated that. What he said about it was he didn't recall whether or when, but we would have let him know. Ms. Chang, I just quoted to you, Mr. Hall was asked whether the prosecutor had told him that they would not be seeking the death penalty, part one, part two, and that he had communicated that to Mr. Kegel. Is there something ambiguous about that section I just read? No, I don't think there's anything ambiguous about that. But I think taken in conjunction with Mr. Hall's testimony about the actual communication, it doesn't rise to a level where the court could find that Mr. Hall directly communicated this information to Mr. Kegel. Let's suppose that in some parts of the testimony, Hall was less than clear about communicating that the death penalty was off the table. But in other parts of his testimony, he was clear that he did know that, did understand it, and communicated that understanding to his client. What's wrong with a trial court making the factual finding that it did even in the face of that kind of inconsistent record? If Mr. Hall testified clearly that he had, in fact, communicated this information to Mr. Kegel, and Mr. Kegel was aware of it, I don't think that there would be a problem with that finding. However, I don't think that that is the case that we have here. Mr. Hall has no clear recollection of it. Mr. Kegel had four different lawyers on this case from the Washoe County Public Defender's Office, and I don't think this is a case where the lawyer is being deceptive, but merely a case of where maybe the right hand didn't know what the left hand was doing. He says, page 390, lines 24, 25, that Judge Hawkins pointed us to, that he did communicate it to Kegel. And his answer, 391, line 1, he says, that's right. Yes, Your Honor. Again, but I would refer the Court to when he has the specific conversation or when he has the specific discussion about how that was communicated, he says, I don't know whether or where, but we would have told him. This is particularly in light of the fact that there is no written communication. There is plenty of correspondence in this case, and this is never reduced to writing. They don't have any memo or any specific recollection of a date. I used to represent criminal defendants. I rarely wrote them letters except when I felt the need to protect myself in such a way, because they weren't big readers usually. They were not your best scholars among my clients. Mr. Hull did testify that they corresponded, and there are letters. We have the letter Mr. Specchio sent Mr. Kegel as well. So they did correspond in this case. This was a very important fact to know for Mr. Kegel, and he continued under. See, I'm thinking just in the natural course of things, a lawyer would communicate orally. The death penalty would come up a lot at the beginning of the case, and then there would probably be multiple communications, don't worry about it, it's off the table. At each step, when it looked like it was going off the table, and then when the notice to seek it wasn't filed on time, don't worry about it, it's gone. Probably Kegel would still be hearing all kinds of stuff in the jail because they always do, and his lawyer mentioned here in the transcript that he kept picking stuff up in the jail. And so with multiple oral communications like that, it would be natural not to remember exactly when you told them and what words you used and all that. Yes, but there was no testimony that there were multiple communications about that. In fact, Steve Gregory said he never talked to Mr. Kegel about the death penalty at all. May I reserve the remainder of my time for rebuttal? Sure. If it pleases the Court, my name is David Neidert. I'm a Senior Deputy Attorney General for the State of Nevada. I represent the respondents in this case. Looking at this case, Your Honors, I think you have in fact pointed out the portions of the record for which Judge Breen, as the finder of fact in the State evidentiary hearing, could make the findings of fact that he in fact did make with respect to the communications about the death penalty. Additionally, and this is just as important, and I argue this in my brief, are the negative inferences that can be drawn from Mr. Kegel's actions in this case. These actions are certainly actions. If Mr. Kegel did in fact think he had to plead guilty or face the death penalty, these actions don't make any sense. What did the plea colloquy tell him with regard to penalty? Well, that's what I was going to get to as far as the plea colloquy does not mention the death penalty at all. That's not word one in there. Does the plea colloquy tell him the maximum penalty he would be subjected to? Yes, it does. And it says there are three options. And then the Court, and it's found actually on page 11 through page 214 of the excerpt of the record, that there are three options that Mr. Kegel is facing, life without the possibility of parole, life with the possibility of parole, or a 20- to 50-year determinate sentence, and that all of these would have a consecutive sentence under Nevada's weapons enhancement statute. So the ---- I guess that doesn't answer the question of what the maximum penalty would have been if he hadn't entered a plea. Is that right? It didn't, but there were other questions that were asked in the plea colloquy. First, the word death was not mentioned at all in the plea colloquy. Under Nevada law, to seek the death penalty, there has to be an affirmative act by the prosecutor to file a document called the notice of intent to seek death penalty. That document was never filed. Would the defendant have known that? The defendant may not have known that, but you would have thought that at the arraignment, Mr. Kegel would have mentioned it. Is this a case where there was a written plea offer from the prosecution? There was a ---- there was ---- I'm not aware if there was a written plea offer. There was a written memorandum of plea negotiations which set forth the three penalties. The word death is not in that. And, in fact, there's an interlineation where it was scratched out because the two theories the case was originally charged were both as both willfully and intentionally, et cetera, and also under Nevada's felony murder law. And they scratched out the section in the plea agreement that talked about felony murder so that they were making it real clear that Mr. Kegel was pleading guilty to intentionally and willfully with malice before thought. This is not a case where there's a plea offer, a written plea offer from prosecution  No, but there was ---- and that makes sense because the testimony of Mr. Hall was that there was some discussion about a death penalty at the time of the preliminary hearing, and then we didn't hear about it thereafter. And, in fact, there was an arraignment where Mr. Kegel pleaded not guilty because they were going to do some pretrial writ practice in the Nevada State courts. And then it was only after that, a second court appearance, that they talked about the ---- where Mr. Kegel entered his plea. But I ---- This whole thing strikes me as being handled quite sloppily, including the State of Nevada. I don't believe so, Your Honor. I mean, you have a serious crime matter here. This person was killed. He was dragged and all that, body hidden. And you think that the prosecutor would, somewhere along the line, bring up the fact that the State isn't seeking the death penalty. Well, in fact ---- To make sure that the defendant knows that. Well, Mr. ---- And he had about, what, four different public defenders. And Mr. Hall testified, and his credibility determinations are entitled to deference, that he was ---- That's true. But there are a lot of contradictions in what he said. He'd say one thing one time that was rather vague, and he'd say something else when he was pushed, and he'd say yes, and some of his answers were compound and ---- But I think Judge Breen's ---- It took him a while to get to the point where he said yes. Isn't that true? The first ---- I will acknowledge the first answer was vaguer than the final answer, but I don't think there's any rule under the deference that because there's a vague answer in the beginning ---- I know that. I know that. I'm just saying it was sloppily handled. I'll acknowledge it might have been handled a little better, but I ---- You can't false a court for saying, well, you realize we're not seeking the death penalty when the State never filed a notice of intent to seek the death penalty. And that was never filed in this case. But I think the other part, and as I argue in my brief, that Mr. Cagle's own actions ---- That's felony murder in there, right? That was felony murder, but that wouldn't necessarily make it an automatic death penalty. There's no automatic death penalty in Nevada. The prosecutor has to take that affirmative step of filing a notice of intent to seek the death penalty. But how would the defendant know this? Well, he can talk to his lawyer about it. He can ask his lawyer about it.  And he says no. Excuse me. I'm sorry. There's no jury here. I'm sorry. No jury. When he says no, that there were no threats made. I have a loud voice. I apologize. That no threats were made, he would have thought it was that, well, yes, there was, Your Honor. I was told that if I didn't plead guilty, they were going to seek the death penalty. You would have thought he would have spoken up at his arraignment and said that. And he didn't. You would have thought that when he was asked if he understood the negotiations and he said yes, we've got to take him at his word. A lot of speculation. I would have thought that somewhere along the line there would be a record where his counsel or the government told him that the State would not seek the death penalty. And there was testimony that that was communicated to him. Yeah, that came a lot later. But there was that testimony. Later after there were a lot of contradictions. But I also go back, and we're looking at this case in the prism of looking into the past as to what Mr. Cagle objectively believed. The other curious fact about this case is that Mr. Cagle, Mr. Cagle never mentioned this in his original State post-conviction petition. You would have thought he would have, and he didn't. If you look at his original State post-conviction petition and his memorandum of points and authorities, the word death penalty is not anywhere contained within those documents. It's only until after he had State, had counsel appointed, and his counsel filed a supplemental pleading do we now suddenly, after the fact, get this allegation. I mean, that shows he didn't know what he was doing when he filed his first pleading. Well, I would have thought that that would have been a more, if you're looking at a rational person figuring what, okay, I'm in prison now. If you're a rational person, he wouldn't be. He committed the crimes he committed. But you would have, you would think, Your Honor, that if Mr. Cagle was in prison going, well, gee, I shouldn't have been in prison, the first thing out of his mouth would be, I'm in prison because they said they were going to try to kill me. It wouldn't be, I'm in prison because I was drunk, and so some prison lawyers now told me that would lessen my mens rea so I wouldn't have the necessary intent to make it first-degree murder. And that's what he argued. In any event, you've got a good teaching point the next time you lecture to a prosecutor's meeting, right? I think I do. Yes, I do, Your Honor. Do you lecture to them? I try to talk to them and not lecture them. Okay. But I think that — It's time to yell at them. I get, I'm excitable, Your Honor, and I sometimes get a little loud. That's all right. But I think in this one, you know, this is, this is the, and I put it in my brief, this is like the Sherlock Holmes story. You would have thought, you know, the Sherlock Holmes story that because the dog didn't bark, you can draw the negative inference, or in that case you draw the inference that the dog knew who he was not barking at. In this case, because Mr. Cagle didn't even bother to mention this, he didn't mention it in his arraignment, when he had several opportunities to say, wait a second, I'm confused here. I thought they were going to seek the death penalty. When he didn't say it in his original state post-conviction petition, you can draw a logical inference. He didn't even say in his first post-conviction relief, only reason I pleaded is I face a death penalty if I didn't? No, it's not. And if you can, you can actually look at his state post-conviction petition, which is in the exhibit record, and it's not there. His, his ground in his, in his initial state post-conviction was I pleaded guilty, but my counsel was ineffective because they did not try to determine whether I was intoxicated or not. That's what he had originally claimed. It was only after he had counsel appointed. That's why all the discussion goes on about voluntary intoxication with Hall in the hearing. I didn't get that. So this is an afterthought, this. And by the way, I thought I faced a death penalty. I think that's a, that's a good way of putting it, Your Honor. That's exactly what it was, that in the original, he originally was worried about intoxication. His attorney at the post-conviction said we can't prove the intoxication part of it. And now we're here arguing about a death penalty that was raised in Mr. Cagle's mind, I believe, for the first time in prison. On that basis, Your Honor, we believe that Judge Hagan was absolutely correct in his ruling and that this, and his ruling should be affirmed. Thank you. Mr. Cagle was a 22-year-old high school dropout with a misdemeanor record. I don't think he could be expected to be familiar with the, I'm sorry. I'm sorry. I have the opposite problem of Mr. Neidert. Mr. Cagle was 22 years old and a high school dropout. I don't think that we could expect him to understand the intricacies of Nevada capital punishment law or that the state would need to file a notice of intent to seek death. Additionally, I'm not sure he was even aware that they weren't seeking that death penalty until counsel was appointed for him on post-conviction and filed a supplemental petition for him. The plea colloquy here and the guilty plea memo, and I understand the pre-sentence report was provided to the court, none of those tell him what maximum penalty he faced at trial. Finally, this isn't a situation where we're saying that the attorney made a threat. It's just that he was under the impression that he was facing the death penalty, so he could not appropriately weigh the choice between entering a plea of guilty and going to trial because he thought he was facing the death penalty if he went to trial. Thank you. Thank you very much. And the matter will stand submitted. The next item is Weisenacher v. Del Papa, and that's submitted on the priest. And the third matter is Bob v. Helling. Thank you.
judges: Pregerson, Kleinfeld, Hawkins